UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RACHEL KURTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-30109-KAR |
| | ) | |
| KRIPALU CENTER FOR YOGA & | ) | |
| HEALTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(Dkt. No. 26)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

Plaintiff Rachel Kurtz ("Plaintiff") alleges that she was injured on August 5, 2014 when

an employee of the Kripalu Center for Yoga & Health, Inc. ("Defendant" or "Kripalu") took a

chair from her as she carried it above her head.  Plaintiff has sued Defendant to recover damages

that she suffered due to Defendant's and its employee's alleged negligence (Dkt. No. 1).

Defendant has moved for summary judgment claiming:  (1) neither it nor its employee was

negligent; (2) Plaintiff released it from liability for her injuries; and (3) to the extent it is liable

for Plaintiff's injuries, it is protected by the charitable immunity statute, Mass. Gen. Laws ch.

231, § 85K (Dkt. No. 26).  For the reasons that follow, to the extent Defendant's motion seeks

summary judgment as to its liability for negligence, it is denied.  Nonetheless, if Defendant is

found liable for Plaintiff's injuries, it qualifies for charitable immunity.

1

II.     BACKGROUND[1]

A.     Kripalu Center for Yoga and Health

Defendant is a Pennsylvania nonprofit charitable organization that was incorporated in 1966 as the Yoga Society of Pennsylvania (Dkt. No. 26-17 ¶¶ 1, 3; Dkt. No. 30 ¶¶ 1, 3).  In 1967, the Internal Revenue Service ("IRS") determined that the Yoga Society of Pennsylvania was "exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code" (Dkt. No. 26-15 at 18-19; Dkt. No. 26-17 ¶ 6; Dkt. No. 30 ¶ 6).[2]  The Yoga Society of Pennsylvania's purpose at the time of its incorporation and at the time of its application to the IRS for tax exempt status was to "'advance the principles, teachings and methods of the science and philosophy of yoga in order the promote the physical well-being and spiritual enlightenment of its members in order to promote the content of the universal brotherhood of man'" (Dkt. No. 26-17 ¶ 8; Dkt. No. 30 ¶ 8).

Defendant has been licensed and authorized to do business in the Commonwealth of Massachusetts since July 8, 1981 (Dkt. No. 26-17 ¶¶ 1, 2; Dkt. No. 30 ¶¶ 1, 2).  Defendant moved its physical presence from Pennsylvania to Massachusetts in 1983 (Dkt. No. 26-17 ¶ 4; Dkt. No. 30 ¶ 4).  In 2007, Defendant changed its name from the Yoga Society of Pennsylvania to the Kripalu Center for Yoga and Health and amended its purpose clause (Dkt. No. 26-17 ¶¶ 4, 9; Dkt. No. 30 ¶¶ 4, 9).  Its principal place of business is located at 57 Interlaken Road,

---

[1] Unless another source is cited, the following facts are drawn from:  Defendants' Statement of Material Facts (Dkt. No. 26-17); and Plaintiff's Response to Defendant's Statement of Material Facts (Dkt. No. 30).  In accordance with the summary judgment standard, the evidence is viewed in the light most favorable to Plaintiff, the nonmoving party.  *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991).

[2] For all tax years including 2014, Defendant filed a Form 990, Return of Organization Exempt from Income Tax (Dkt. No. 26-15 at 31-67; Dkt. No. 26-17 ¶ 7; Dkt. No. 30 ¶ 7).

Stockbridge, Massachusetts where it conducted all of its business activities in 2014 (Dkt. No. 26-17 ¶ 5; Dkt. No. 30 ¶ 5).

Defendant operated the following educational and training schools: the School of Yoga, which trained yoga teachers; the School of Ayurveda, which trained Ayurveda health counselors; the School of Integrated Yoga Therapy, which trained yoga therapists; and the School of Mindful Outdoor Leadership, which was established in 2018 to train outdoor guides (Dkt. No. 26-17 ¶¶ 11, 12; Dkt. No. 30 ¶¶ 11, 12). The courses in the School of Yoga and the School of Ayurveda were open to the members of the public who were not pursuing certification in those disciplines (Dkt. No. 26-17 ¶ 15; Dkt. No. 30 ¶ 15).

The programs and services that were offered through Defendant's Retreat and Renewal, Luminary, and Healing Arts Departments were also open to the general public (Dkt. No. 26-17 ¶¶ 16, 24; Dkt. No. 30 ¶¶ 16, 24). The Retreat and Renewal Department featured personalized retreat programs, which included accommodations, meals, workshops, outdoor activities, yoga, and the use of Kripalu's amenities (Dkt. No. 26-17 ¶¶ 17, 20; Dkt. No. 30 ¶¶ 17, 20). The Luminary Department's programs were mostly seminars, which supported Kripalu's mission and benefitted yoga instructors (Dkt. No. 26-17 ¶¶ 17, 18; Dkt. No. 30 ¶¶ 17, 18). The Healing Arts Department offered body and lifestyle consultations, including massages, facials, and other services (Dkt. No. 26-17 ¶¶ 17, 21; Dkt. No. 30 ¶¶ 17, 21). A portion of the income from the Healing Arts Department's services and activities were unrelated to Defendant's tax-exempt purpose (Dkt. No. 26-15 at 35, 39, 40; Dkt. No. 30 ¶ 23).

B.    August 5, 2014

Plaintiff had been a guest at Kripalu approximately eight times prior to July 2014 (Dkt. No. 26-17 ¶ 30; Dkt. No. 30 ¶ 30). In July 2014, she was accepted to attend Kripalu's School of

Yoga's 200-hour training course to become a certified yoga instructor (Dkt. No. 26-17 ¶¶ 25, 27, 28; Dkt. No. 30 ¶¶ 25, 27, 28).  The certification course was held from July 27 to August 22, 2014 (Dkt. No. 26-17 ¶ 26; Dkt. No. 30 ¶ 26).  Plaintiff stayed at Kripalu while she attended the classes, which were held from 6:00 A.M. until 6:00 P.M. with a break for lunch (Dkt. No. 26-17 ¶¶ 27, 28; Dkt. No. 30 ¶¶ 27, 28).  Plaintiff was allowed to participate in Kripalu's other programs and events during her lunch break and after 6:00 P.M. (Dkt. No. 26-17 ¶ 29; Dkt. No. 30 ¶ 29).

On August 5, 2017, Plaintiff attended morning yoga (Dkt. No. 26-17 ¶ 33; Dkt. No. 30 ¶ 33).  The class was held in a large room with chairs available for the students' use (Dkt. No. 26-17 ¶ 34; Dkt. No. 30 ¶ 34).  Plaintiff took a metal-frame, stackable chair and sat on it during the lesson (Dkt. No. 26-9 at 18; Dkt. No. 26-17 ¶ 35; Dkt. No. 30 ¶ 35).

Plaintiff had used stackable chairs during activities at Kripalu "[m]any times" before August 5, 2014 and had returned them without incident or complaint (Dkt. No. 26-9 at 18; Dkt. No. 26-17 ¶ 38; Dkt. No. 30 ¶ 38).  She had either stacked the chair herself or a Kripalu staff member took the chair from her and stacked it (Dkt. No. 26-17 ¶ 39; Dkt. No. 30 ¶ 39).[3]

At the conclusion of the morning yoga session on August 5, 2014, Plaintiff set about putting her chair away in order to assist in clearing the room for the dance yoga class that was scheduled to be held at noon (Dkt. No. 26-17 ¶¶ 33, 35, 36; Dkt. No. 30 ¶¶ 33, 35, 36).  Plaintiff lifted the chair over her head by holding the legs and maintained that position as she carried the chair to the side of the room where two members of Kripalu's staff were stacking the chairs (Dkt. No. 26-9 at 19; Dkt. No. 26-17 ¶ 45; Dkt. No. 30 ¶ 45).  According to Plaintiff's deposition

_____

[3] A production crew of employees and volunteers set up and cleared rooms for Kripalu's events (Dkt. No. 26-17 ¶ 42; Dkt. No. 30 ¶ 42).

testimony, without warning, Mr. Cook, a staff member, suddenly grabbed the chair that she was holding above her head (Dkt. No. 26-9 at 19; Dkt. No. 26-17 ¶¶ 46, 47; Dkt. No. 30 ¶¶ 46, 47). The chair swung and struck Plaintiff's head (Dkt. No. 26-9 at 19; Dkt. No. 26-17 ¶ 46; Dkt. No. 30 ¶ 46). Plaintiff alleges that she suffered a concussion as a result (Dkt. No. 26-17 ¶ 51; Dkt. No. 30 ¶ 51).

      C.     <u>Guest Participation Agreement and Release</u>

On July 27, 2014, before Plaintiff participated in the training program for which she had registered, she signed Kripalu's Guest Participation Agreement and Release ("Release") (Dkt. No. 26-13; Dkt. No. 26-17 ¶ 32; Dkt. No. 30 ¶ 32). In pertinent part, the Release stated:

**Guest Activities and Need to Self-Monitor**

. . . As a guest, I have the opportunity to take part in a range of activities designed to enhance my health and well-being. This includes activities specific to the program I am taking, as well as general activities outside my program, offered to all Kripalu guests.

These general activities include yoga and dance classes; exercise and conditioning classes; strength training; massage and bodywork; share circles and other personal growth experiences; relaxation and meditation instruction; lectures on various topics that often include a participatory component; outdoor recreation and fitness pursuits, such as bicycling, hiking, kayaking, and winter sports; and other activities not mentioned here.

Whether specific or general, I recognize that activities of this nature involve an element of physical, emotional, and psychological risk. I understand each person's level of physical and psychological fitness is different, and that some activities may not be appropriate for me given my individual capacities. I accept the need to monitor my own participation, knowing that each activity, and each exercise within any given activity, is optional. It is fine for me to sit an activity or exercise out, or let my instructor know that I am choosing not to participate, or otherwise ask for help. . . .

**Release of Liability**

After being informed of the above risks and responsibilities, I generally release Kripalu Center for Yoga & Health, together with its instructors and other representatives, from all claims, causes of action, medical expenses, and other costs related to my guest participation, whether they arise at Kripalu, or from my later use of information or instruction at home. . . .

(Dkt. No. 26-13).

III.    STANDARD OF REVIEW

"Summary judgment is proper where 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (quoting Fed. R. Civ. P. 56(c)). "A factual dispute is 'genuine' if 'it may reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)). "[A] fact is 'material' 'if its existence or nonexistence has the potential to change the outcome of the suit.'" *Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 7 (1st Cir. 2015) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).

In ruling on summary judgment, the court "view[s] 'the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 869 (1st Cir. 1998) (quoting *Griggs-Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990)). "A party seeking summary judgment is responsible for identifying those portions of the record, 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Massacani v. Kelly Servs., Inc.*, Civil Action No. 3:16-cv-30069-KAR, 2018 WL 443448, at *1 (D. Mass. Jan. 16, 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant can meet this burden "either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F.

Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). If the moving party meets its burden, "'the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Carroll*, 294 F.3d at 236). "'[T]he nonmoving party "may not rest upon mere allegations or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s]he would bear the ultimate burden of proof at trial.'" *Id.* (third alteration in original) (quoting *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997)). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."'" *Id.* at 152-53 (quoting *DeNovellis*, 124 F.3d at 306).

IV.    ANALYSIS

Defendant's motion for summary judgment poses three questions. The first is whether the facts, when viewed in the light most favorable to the Plaintiff, require a determination that Defendant was not negligent as a matter of law. The next inquiry addresses whether Plaintiff waived a negligence claim against Defendant by signing the Release. The final question relates to whether the Massachusetts charitable immunity statute limits Defendant's liability, if any, to $20,000. Each of these queries will be addressed in turn.[4]

A.    Negligence

Defendant presses the argument that it did not breach its duty to Plaintiff as a matter of law (Dkt. No. 26-16 at 5-9). Plaintiff counters that Defendant's arguments are based on premises liability, which does not apply to the circumstances presented here. Rather, according to

---

[4] There is no dispute that Massachusetts law applies to this case (Dkt. No. 26-16 at 3-5; Dkt. No. 29 at 4).

Plaintiff, under the principles of common law negligence, Defendant owed Plaintiff a duty to exercise reasonable care and Mr. Cook breached that duty when he grabbed the chair from Plaintiff. In addition, Plaintiff alleges that Defendant breached its duty by failing to adequately train its employees on how to safely handle the removal of chairs while clearing a room (Dkt. No. 29 at 4-7). Plaintiff has the better of the arguments.

       **1.**      **Defendant is not entitled to summary judgment on Plaintiff's common law negligence claim.**

Plaintiff contends that Defendant is liable for the negligence of its employee on a theory of respondeat superior. In Massachusetts, a plaintiff may impute liability to an employer for the torts committed by its employees through the doctrine of respondeat superior or vicarious liability if the "'torts [were] committed by employees while acting in the scope of their employment.'" *Dias v. Brigham Med. Assocs., Inc.,* 780 N.E.2d 447, 451 (Mass. 2002) (quoting RESTATEMENT (THIRD) OF AGENCY § 2.04 (AM. LAW INST., Tent. Draft No. 2, 2001)). The conduct of an employee "'is within the scope of employment if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer.'" *Mosko v. Raytheon Co.,* 622 N.E.2d 1066, 1068 (Mass. 1993) (citations omitted) (quoting *Wang Labs., Inc. v. Bus. Incentives, Inc.,* 501 N.E.2d 1163, 1166 (Mass. 1986)). Because there is no dispute that Mr. Cook was acting within the scope of his employment when Plaintiff was injured, Defendant's motion for summary judgment concerns whether Mr. Cook was negligent.

"To prevail on a negligence claim [in Massachusetts], a plaintiff must prove [1] that the defendant owed the plaintiff a duty of reasonable care, [2] that the defendant breached this duty, [3] that damage resulted, and [4] that there was a causal relation between the breach of the duty and the damage." *Jupin v. Kask*, 849 N.E.2d 829, 834–35 (Mass. 2006). Notwithstanding the

fact that the elements are "conjunctive, meaning that a defendant must demonstrate only that no genuine dispute exists as to the facts material to any one element to prevail on summary judgment," *Hartford Fire Ins. Co. v. Labchem, Inc.*, CIVIL ACTION NO. 13-13217-RWZ, 2015 WL 12684463, at \*2 (D. Mass. Oct. 27, 2015) (citing *Lopez v. Equity Office Mgmt., LLC*, 597 F. Supp. 2d 189, 192 (D. Mass. 2009)), "whether a defendant exercised reasonable care, the extent of the damage caused, and whether the defendant's breach and the damage were causally related [are generally] the special province of the jury." *Jupin*, 849 N.E.2d at 835 (citing *Mullins v. Pine Manor Coll.*, 449 N.E.2d 331, 338 (Mass. 1983)).[5]

"[T]he existence of a duty is a question of law, and is thus an appropriate subject of summary judgment." *Id. See Davis v. Westwood Grp.*, 652 N.E.2d 567, 569 (Mass. 1995) ("Whether . . . a duty exists is a question of law."). Defendant contends that it did not owe Plaintiff a duty to exercise reasonable care to prevent the injury that she alleges she suffered. "There can be negligence only where there is a duty to be careful." *Yakubowicz v. Paramount Pictures Corp.*, 536 N.E.2d 1067, 1070 (Mass. 1989). "As a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others." *Remy v. MacDonald*, 801 N.E.2d 260, 262–63 (Mass. 2004). *See* RESTATEMENT (SECOND) OF TORTS § 302 cmt. a (AM. LAW INST. 1965) ("In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act"). "A precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor." *Jupin*, 849 N.E.2d at 835. *See Foley v. Bos. Hous. Auth.*, 555 N.E.2d 234, 237-38 (Mass. 1990) ("'There is no duty owed

---

[5] Defendant's summary judgment motion does not challenge the damage element.

when the risk which results in the plaintiff's injury is not one which could be reasonably anticipated by the defendant'") (quoting *Husband v. Dubose,* 531 N.E.2d 600, 602 (Mass. App. Ct. 1988)). "Consequently, with some important exceptions, 'a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.'" *Jupin,* 849 N.E.2d at 835 (further citation omitted). *See* RESTATEMENT (SECOND) OF TORTS § 284 (AM. LAW INST. 1965) ("Negligent conduct may be . . . an act which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another . . . ."). "To the extent that a legal standard does exist for determining the existence of a tort duty . . . , it is a test of the "reasonable foreseeability" of the harm.'" *Jupin,* 849 N.E.2d at 836 (citation omitted).

In the instant case, Plaintiff was a guest at Kripalu. The chair that she was carrying above her head was a bulky object with sharp edges. Mr. Cook, Defendant's employee, was legally obligated to be careful when he took the chair from Plaintiff and the manner in which he grabbed the chair posed a foreseeable risk that Plaintiff would be injured. Therefore, Defendant owed Plaintiff a duty to exercise reasonable care as a matter of law. *See Mullins,* 449 N.E.2d at 336 ("It is an established principle that a duty voluntarily assumed must be performed with due care."); *Sheridan v. Hotels Statler Co.,* 185 N.E. 33, 33 (Mass. 1933) (the hotel doorman had a duty "to use reasonable care to make sure that those upon whom he was attending were so arranged within the cab that the door could be closed without injury to them, and that in closing it while looking elsewhere, he was not performing that duty.").

"[W]here a duty of care is established . . . , the standard by which a party's performance is measured is the conduct expected of an ordinarily prudent person in similar circumstances." *Toubiana v. Priestly,* 520 N.E.2d 1307, 1310 (Mass. 1988). "Negligence is the doing of

10

something, which a reasonably prudent person, in the ordinary course of human events, would not do, or the failure to do something which a reasonable person of ordinary prudence would do." *Mass. Lobstermen's Ass'n, Inc. v. United States*, 554 F. Supp. 740, 742 (D. Mass. 1982). *See Toubiana*, 520 N.E.2d at 1310 ("'[Negligence] is a want of diligence commensurate with the requirement of the duty at the moment imposed by the law.'") (quoting *Altman v. Aronson,* 121 N.E. 505, 506 (Mass. 1919)). Plaintiff argues that Defendant's employee breached the duty of care (was negligent) when, without warning, he grabbed the chair from Plaintiff who was carrying the chair above her head (Dkt. No. 29 at 4-5). According to Plaintiff, a reasonably prudent person either would have warned Plaintiff that he was going to take the chair from her or would have let her set it down before he picked it up and stacked it (*id.*). Whether Mr. Cook was negligent by failing to act in this manner presents a factual question that cannot be resolved on summary judgment. *See Roderick v. Brandy Hill Co.*, 631 N.E.2d 559, 560 (Mass. App. Ct. 1994) ("Ordinarily, summary judgment is not an appropriate means to resolve negligence cases, because usually the question of negligence is one of fact.") (citing *Mullins* 449 N.E.2d at 338).

In order to prove the causation element, "[a] plaintiff need only show 'that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause.'" *Mullins,* 449 N.E.2d at 338-39 (quoting *McLaughlin v. Bernstein,* 249 N.E.2d 17, 22 (Mass. 1969)). Whether Mr. Cook's allegedly negligent conduct caused Plaintiff's concussion is also a question of fact that is not conducive to resolution at this stage of the litigation. *See Mullins,* 449 N.E.2d at 338 ("The question of causation is generally one of fact for the jury.").

Defendant's primary response to Plaintiff's negligence claim is reliance on the law applicable to premises liability (Dkt. No. 26-16 at 5-7). According to the theory of premises liability,

> an owner or possessor of land owes a common law duty of reasonable care to all lawful visitors, [and] [t]his duty includes an obligation to maintain the premises in reasonably safe condition and to warn visitors of any unreasonable dangers of which the landowner is aware or reasonably should be aware.

*Davis*, 652 N.E.2d at 569–70 (citation omitted). Defendant maintains that Plaintiff fails to identify a "defective or dangerous" condition on the premises of which Defendant had notice and a concomitant duty to warn Plaintiff (Dkt. No. 26-16 at 5-7). But Plaintiff does not allege, for example, that she tripped on an uneven floor. Inasmuch as the action of an employee when handling a chair is not the sort of hazardous condition on land or property contemplated by the principles of premises liability, that theory does not apply to absolve Defendant of its legal duty. *Compare Athas v. United States*, 904 F.2d 79, 81 (1st Cir. 1990) ("the traditional Massachusetts rule [is] that there must be a defect . . . in order to hold a landowner liable for negligence."); *Bowers v. P. Wile's, Inc.,* 54 N.E.3d 1089, 1092, 1096 (Mass. 2016) (premises liability was at issue where a customer tripped on a stone that had "migrated" from a gravel area onto a walkway that led into a store); *Papadopoulos v. Target Corp.*, 930 N.E.2d 142, 150 (Mass. 2010) ("the general rule of premises liability [is] that a property owner owes a duty to all lawful visitors to use reasonable care to maintain its property in a reasonably safe condition in view of all the circumstances.").

Because a factfinder could determine that Defendant's negligence caused Plaintiff's injuries, summary judgment for Defendant is not appropriate.

> **2.** **Defendant is not entitled to summary judgment on Plaintiff's allegation that it was negligent in failing to train, educate, and instruct its employees.**

In addition to the claim of common law negligence, Plaintiff alleges that Defendant was negligent in failing to train, educate, and instruct its employees "in the safe removal or rearrangement of chairs, tables and any other items in its classrooms" (Dkt. No. 1 ¶ 11). Because this claim is based on a theory of negligence, Plaintiff has the burden to prove the same elements that are required to prove her common law negligence claim: "duty, breach of duty (or, the element of negligence), causation . . . and damages." *Ulwick v. DeChristopher*, 582 N.E.2d 954, 958 (Mass. 1991).

Defendant contends that summary judgment should enter in its favor because it did not have a legal duty to train its employees on how to handle chairs when guests assisted in clearing the rooms. *See Davis,* 652 N.E.2d at 569 ("Before liability for negligence can be imposed, there must first be a legal duty owed by the defendant to the plaintiff, and a breach of that duty proximately resulting in the injury."). Defendant maintains that it was in the same position as a landowner who "has no duty to protect lawful visitors on his property from risks that would be obvious to persons of average intelligence," *Toubiana*, 520 N.E.2d at 1311, and as an employer who is not obligated to warn or train its employees as to dangers that are "obvious or could be discovered by reasonable inspection," *Burr v. Mass. Elec. Co.,* 248 N.E.2d 492, 495 (Mass. 1969) (Dkt. No. 26-16 at 7-9). *See O'Sullivan v. Shaw,* 726 N.E.2d 951, 954–55 (Mass. 2000) ("Landowners are relieved of the duty to warn of open and obvious dangers on their premises because it is not reasonably foreseeable that a visitor exercising (as the law presumes) reasonable care for his own safety would suffer injury from such blatant hazards."); *Davis,* 652 N.E.2d at 570 n.9 ("If a risk is of such a nature that persons of ordinary intelligence would be aware of it, a landowner generally has no duty to warn of the risk."); *Thorson v. Mandell*, 525 N.E.2d 375, 379 (Mass. 1988) (same).

According to Defendant, by analogy, it was relieved of its duty to train its employees to be careful when taking chairs from guests because it did not have notice that the activity posed a risk to guests and because an employee of ordinary intelligence should have recognized the obvious danger in suddenly grabbing a chair a guest was holding above her head (Dkt. No. 26-16 at 7-9). However, Defendant cites no authority for its position. Instead, the authorities upon which it relies involve landowners and employers who are relieved from their duties to warn visitors of obvious dangers on their property. *Compare O'Sullivan*, 726 N.E.2d at 956 (granting summary judgment for defendant where "the open and obvious danger rule obviated any duty to warn the plaintiff not to dive headfirst into the shallow end of the defendant's swimming pool."); *Burr*, 248 N.E.2d at 495 ("There is no duty to warn of dangers which are obvious or could be discovered by reasonable inspection and therefore there was no breach of duty owed by the defendant to [its employee].") (citation omitted); *LeBlanc v. Atl. Bldg. & Supply Co.,* 84 N.E.2d 10, 12 (Mass. 1949) (defendant had no duty to warn a business visitor of a canvas on the driveway of its premises where the canvas's presence was "obvious"); *Drake v. Bos. Safe Deposit & Tr. Co.*, 30 N.E.2d 226, 228 (Mass. 1940) ("Where a condition is obvious to an ordinarily intelligent [employee] there is no duty on the part of any one to warn [the employee] of that condition."); *Lanza v. EQR-Lincoln Lawrence, LLC,* 868 N.E.2d 138, 141 (Mass. App. Ct. 2007) (legal principles applicable to premises liability supported summary judgment for employer who was not responsible for a delivery man's injuries caused by an "'open and obvious danger'" that should have been apparent to the ordinary employee) (quoting *Ray v. Western Union Tel. Co.,* 154 N.E. 853, 854 (Mass. 1927)); *Costa v. Bos. Red Sox Baseball Club,* 809 N.E.2d 1090, 1093 (Mass. App. Ct. 2004) ("Viewing the present case through the lens of the defendant's duty, we are persuaded that the potential for a foul ball to enter the stands and injure a spectator who is

seated in an unscreened area is, as matter of law, sufficiently obvious that the defendant reasonably could conclude that a person of ordinary intelligence would perceive the risk and need no additional warning.").

There are significant distinctions between the facts of the instant case and those of the authorities upon which the Defendant relies. First, Defendant's argument appears to equate Mr. Cook with the plaintiffs in the "open and obvious" danger cases. According to Defendant, it had no duty to instruct Mr. Cook who, like the plaintiffs in the cited cases, should have recognized the danger in grabbing the chair from Plaintiff (Dkt. No. 26-16 at 7-9). However, this case does not concern Defendant's duty to Mr. Cook, but addresses whether Defendant owed a duty of reasonable care to Plaintiff, who was a guest at Defendant's facility. A further distinction is the fact that Plaintiff does not allege that she was injured by an evidently dangerous condition on the property or an obvious risk in the activity in which she was engaged. Rather, she alleges that her injury was caused by Defendant's failure to instruct its employees on the proper manner of rearranging furniture after an event. The facts, therefore, do not support the conclusion that Defendant did not have a legal duty to train its employees.

Whether Defendant breached its duty to Plaintiff by failing to adequately train its employees and whether the breach caused Plaintiff's injury present genuine questions of material fact. Mr. Cook was a volunteer member of the production staff (Dkt. No. 26-17 ¶¶ 42, 47; Dkt. No. 30 ¶¶ 42, 47). The production staff's duties included breaking down rooms after events and stacking chairs (Dkt. No. 26-17 ¶ 42; Dkt. No. 30 ¶ 42). Kripalu's guests routinely helped clear the chairs (Dkt. No. 26-17 ¶ 38; Dkt. No. 30 ¶ 38). Plaintiff had returned chairs to the stacking area without incident "many times" in the past (*id.*). Although the Kripalu Production Training Manual included a "Production Support Equipment Safety Guide" that provided the production

staff with guidance on how to safely use and maneuver the production support equipment including chairs (Dkt. No. 26-15 at 108), Defendant fails to present evidence showing that Mr. Cook received the Production Training Manual or received specific training on how to handle and stack chairs (Dkt. No. 29 at 6-7).[6] Consequently, whether Defendant breached its duty to Plaintiff by failing to train its employees on how to interact with guests while clearing a room presents a factual question. In addition, "[t]o prevail on [a] negligent training claim, it is not enough for the plaintiff to show deficiencies in the training program. A causal relationship between any breach of duty and the harm suffered by the plaintiff is an essential element of [the] claim." *Nelson v. Salem State College,* 845 N.E.2d 338, 349 (Mass. 2006). Whether Defendant's failure to train Mr. Cook caused Plaintiff's injury also presents a question of fact.

Defendant has failed to demonstrate that it did not owe Plaintiff a duty to exercise reasonable care as a matter of law. Because there is evidence to support the elements of Plaintiff's common law negligence and negligent training claims, Defendant's motion for summary judgment is denied.

B.      The Release

The Defendant argues that, even if it owed Plaintiff a duty of reasonable care, the general Release that she signed relieves it of liability for negligence. Because Defendant raised the issue of Plaintiff's release of liability as an affirmative defense, the burden shifts to Plaintiff to demonstrate that the release does not bar the suit. *See Sharon v. City of Newton*, 769 N.E.2d 738, 742-43 (Mass. 2002). Plaintiff does not deny that she signed the Release but maintains that whether the scope of the Release extends to the activities in which she was engaged when she was injured involves a question of fact. In the alternative, Plaintiff asserts that Mass. Gen. Laws

---

[6] At the hearing, Defendant's counsel indicated that Mr. Cook was not deposed.

ch. 93 § 80 invalidates the Release. Because the terms of the Release are ambiguous, Defendant is not entitled to summary judgment as a matter of law.

Kripalu's Guest Participation Agreement and Release "generally release[d] Kripalu Center for Yoga and Health [and] its instructors and other representatives from all claims, causes of action, medical expenses, and other costs related to [Plaintiff's] *guest participation* . . . ." (Dkt. No. 26-13) (emphasis added). According to the Release, the "Guest Activities" included "activities specific to the program [Plaintiff was] taking as well as general activities outside [her] program, offered to all Kripalu guests" (*id.*).

> These general activities include[d] yoga and dance classes; exercise and conditioning classes; strength training; massage and bodywork; share circles and other personal growth experiences; relaxation and meditation instruction; lectures on various topics that often include a participatory component; outdoor recreation and fitness pursuits, such as bicycling, hiking, kayaking, and winter sports; and other activities not mentioned here.

(*id.*).

"A party may, by agreement, allocate risk and exempt itself from liability that it might subsequently incur as a result of its own negligence." *Sharon*, 769 N.E.2d at 744 (citing cases). "[R]eleases are a form of contract." *LeBlanc v. Friedman*, 781 N.E.2d 1283, 1287 (Mass. 2003). "If a contract, [such as a release], is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment." *Seaco Ins. Co. v. Barbosa*, 761 N.E.2d 946, 951 (Mass. 2002) (citing *Lexington Ins. Co. v. All Regions Chem. Labs, Inc.,* 647 N.E.2d 399, 400 (Mass. 1995)). "Where, however, the [release] has terms that are ambiguous, uncertain, or equivocal in meaning, the intent of the parties is a question of fact to be determined at trial." *Id.* (citing *Robert Indus., Inc. v. Spence,* 291 N.E.2d 407, 409 (Mass. 1973)). "[A]ny doubts about the interpretation of the release must be resolved in the plaintiff's favor." *Cormier v. Cent. Mass. Chapter of the Nat'l Safety Council,* 620 N.E.2d 784, 786 (Mass. 1993).

The initial question is whether the contract that Plaintiff signed is a general or comprehensive release that "dispose[s] 'of all claims and demands arising out of *any* transactions between' the parties" as a matter of law. *LeBlanc*, 781 N.E.2d at 1287 (quoting *Schuster v. Baskin*, 236 N.E.2d 205, 208 (Mass. 1968)). If the Release is general, it relieves Defendant of liability for any negligence that occurred while Plaintiff was a guest at Kripalu. *See id.* at 1287-88. However, the language of the Release in the instant case is not on a par with the broad language that Massachusetts courts have construed as general releases. *See Cormier*, 620 N.E.2d at 785, 786 ("The form stat[ing] that the plaintiff agreed to 'release the Central Mass Safety Council, its members, employees, agents, representatives and those governmental agencies and other organizations affiliated with this course from *any and all* liability, loss, damage, costs, claims and/or causes of action, including *but not limited to* all bodily injuries and property damage arising out of participation in the motorcycle training course referred to above, it being specifically understood that said program includes the operation and use by the undersigned participant and others of motorcycles'" was deemed to be a general release) (emphasis added); *Schuster*, 236 N.E.2d at 207, 208 ("The release [covering 'all claims and demands'] is broad and general."); *Salm v. Revere Teamworks, LLC,* No. 16-P-577, 2017 WL 946412, at *1-2 (Mass. App. Ct. Mar. 10, 2017) (unpublished) (finding the release containing the following language to be unambiguous and sufficient to bar plaintiff's negligence claims against the sports facility where he was injured playing ultimate frisbee: "I . . . HEREBY RELEASE, INDEMNIFY, AND HOLD HARMLESS THE . . . owners and lessors of the premises used for the activity (Releasees), WITH RESPECT TO ANY AND ALL INJURY, DISABILITY, DEATH, or loss or damage to person or property, WHETHER ARISING FROM THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE, to the fullest extent permitted by law."). Here, the language of

the Release limited its scope. While Plaintiff generally released Kripalu and its employees from all claims and causes of action, the general release was limited to claims related to Plaintiff's "guest participation," a term that was not defined (Dkt. No. 26-13). "Guest activities," a term that was defined, was limited to participation in Kripalu's programs, such as classes and sports activities (*id.*).

The question then becomes whether the Release, as limited, extends to discharge Defendant's liability for Plaintiff's negligence claims. Given that Plaintiff was injured while she was putting away a chair after her morning yoga session had concluded, it is unclear whether the activity in which she was engaged when she was injured was "related to" her "guest participation" as contemplated by the terms of the Release (Dkt. No. 26-17 ¶¶ 33, 35, 45-47, 51; Dkt. No. 30 ¶¶ 33, 35, 45-47, 51). The Release's ambiguity creates a genuine issue of material fact as to its scope and Defendant is not entitled to summary judgment based on the affirmative defense of release. *See LeBlanc*, 781 N.E.2d at 1287 ("Because the interpretation of a contract is a question of law for the courts, and releases are a form of contract, the question has a legal element: What acts does the release cover? If there are facts material to this mixed question in dispute, summary judgment cannot be granted.") (citations omitted); *Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Mass., Inc.*, 945 N.E.2d 964, 970-71 (Mass. App. Ct. 2011) ("An ambiguity arises from language susceptible of different meanings in the eyes of reasonably intelligent persons. . . . Once a contractual ambiguity emerges, the meaning of the uncertain provision becomes a question of fact for the trier.") (citations omitted).

The terms of the Release do not conclusively relieve Defendant of liability.

Consequently, Plaintiffs negligence claim survives Defendant's motion for summary judgment.[7]

C.      Charitable Immunity

Defendant has raised the affirmative defense of charitable immunity under Mass. Gen.

Laws ch. 231, § 85K and seeks a declaration as to its applicability.   The statute provides, in

relevant part:

> It shall not constitute a defense to any cause of action based on tort brought against a
> corporation, trustees of a trust, or members of an association that said corporation, trust,
> or association is or at the time the cause of action arose was a charity; provided, that if
> the tort was committed in the course of any activity carried on to accomplish directly the
> charitable purposes of such corporation, trust, or association, liability in any such cause
> of action shall not exceed the sum of twenty thousand dollars exclusive of interest and
> costs . . . .   Notwithstanding any other provision of this section, the liability of charitable
> corporations, the trustees of charitable trusts, and the members of charitable associations
> shall not be subject to the limitations set forth in this section if the tort was committed in
> the course of activities primarily commercial in character even though carried on to
> obtain revenue to be used for charitable purposes.

Mass. Gen. L. c. 231, § 85K.   In order to limit its liability, Defendant "has the burden of proving

'both that it is a charitable organization and that the tort complained of fell within the range of

activities covered by the cap.'"   *Shervin v. Partners Healthcare Sys., Inc.*, 2 F. Supp. 3d 50, 80

(D. Mass. 2014), *aff'd,* 804 F.3d 23 (1st Cir. 2015) (quoting *Conners v. Ne. Hosp. Corp.,* 789

N.E.2d 129, 132 (Mass. 2003)).   *See Fine Mortuary Coll., LLC v. Am. Bd. of Funeral Serv.*

*Educ., Inc.*, 473 F. Supp. 2d 153, 161 (D. Mass. 2006); *Goldberg v. Ne. Univ.,* 805 N.E.2d 517,

521 (Mass. App. Ct. 2004).   Because the material facts on this issue are not in dispute, Defendant

has sustained its burden of demonstrating that it is entitled to the statutory cap on liability as a

---

[7] Because the court finds that the Release is ambiguous and does not necessarily release the
claims asserted by the Plaintiff, the court need not, and does not, reach the question raised by
Plaintiff of whether the Release is barred by the provisions of the Massachusetts Health Club
Services Contracts Act, Mass. Gen. Laws ch. 93, §§ 78-88.

matter of law.  *See Mazzone v. Bos. Univ.,* Civil Action No. 17-10284-NMG, 2019 WL 246767, at *3 (D. Mass. Jan. 16, 2019) (allowing partial summary judgment based on the defendant's demonstration that it qualified for charitable immunity); *Shervin,* 2 F. Supp. 3d at 80 (same).

### 1.    Defendant qualifies as a charitable organization.

The undisputed evidence supports the finding that Defendant is a charitable organization. "'Charity in the legal sense "is not confined to mere almsgiving or the relief of poverty and distress, but has wider signification, which embraces the improvement and promotion of the happiness of man" . . . .'"  *Barrett v. Brooks Hosp., Inc.,* 157 N.E.2d 638, 641 (Mass. 1959), *overruled on other grounds by Colby v. Carney Hosp.,* 254 N.E.2d 407 (Mass. 1969) (citations omitted).

> "An institution will be classed as charitable if the dominant purpose of its work is for the public good and the work done for its members is but the means adopted for this purpose. But if the dominant purpose of its work is to benefit its members or a limited class of persons it will not be so classed, even though the public will derive an incidental benefit from such work."

*Conners,* 789 N.E.2d at 133 (citations omitted).  "The size of an institution is irrelevant to a determination of charitable status, as is the source of its revenue."  *Id.* at 134.

Whether or not an institution is charitable depends on "'the language of its charter or articles of association, constitution and by-laws and upon the objects which it serves and the method of its administration,' that is, 'upon its purposes declared and the work done.'"  *Bd. of Assessors of Bos. v. Garland Sch. of Home Making,* 6 N.E.2d 374, 380 (Mass. 1937) (citations omitted).  *See New England Legal Found. v. City of Bos.,* 670 N.E.2d 152, 158 (Mass. 1996) ("Evidence of [the] dominant purpose can come from a host of sources.").  "When a corporation presents a charter that shows the corporation to be charitable, that charter is prima facie evidence of the corporation's charitable purpose and operation."  *Goldberg*, 805 N.E.2d at 522 (citing

*Barrett,* 157 N.E.2d at 640). Defendant's Articles of Incorporation (Charter) for the Yoga Society of Pennsylvania, which later became Kripalu, were filed in conformance with Pennsylvania's "'Non-Profit Corporation Law'" (Dkt. No. 26-15 at 7-10; Dkt. No. 26-17 ¶¶ 3, 4; Dkt. No. 30 ¶¶ 3, 4). The Charter stated that Kripalu aimed "[t]o advance the principles, teachings and methods of the science and philosophy of Yoga in order to promote the physical and mental well-being and spiritual enlightenment of its members in order to promote the concept of the universal brotherhood of man" (Dkt. No. 26-15 at 7, 8, 10). Defendant's "New Purpose Clause," which replaced the original charter's purpose clause in 2007, stated that its mission was to:

> (1) [a]dvance the physical, mental, emotional, and spiritual well-being of individuals, and uplift society, by promoting the art, science, practices and philosophy of yoga; and (2) [p]romote other traditional and contemporary approaches to life that integrate body, mind, and spirit and help individuals and groups flourish and perform at peak levels through practices and beliefs similar to yoga; and (3) [p]romote traditional and contemporary healing modalities and integrate body, mind, and spirit and otherwise cultivate well-being by educating the public on the expression of these healing modalities in complementary and alternative medicine; and (4) [p]romote the philosophy of Santana Dharma or the "Perennial Wisdom," which advocates the unfettered inquiry into all approaches that benefit individuals and uplift society and propounds the universal brotherhood and sisterhood of humankind; and (5) [e]ngage in other activities incidental or related to the above purposes that are not prohibited by Section 501(c)(3) of the Internal Revenue Code or any other laws.

(Dkt. No. 26-17 ¶ 9; Dkt. No. 30 ¶ 9).[8]

---

[8] "Yoga" (capitalized) is defined as "a Hindu theistic philosophy teaching the suppression of all activity of body, mind, and will in order that the self may realize its distinction from them and attain liberation" and "yoga" is "a system of physical postures, breathing techniques, and sometimes meditation derived from Yoga but often practiced independently especially in Western cultures to promote physical and emotional well-being." *Yoga and yoga Definitions, Merriam-Webster.com,* https://www.merriam-webster.com/dictionary/yoga (last visited January 28, 2019).

Because Defendant accomplishes its articulated objectives through instructional programs, seminars, workshops, retreats, and professional training, it is primarily an educational institution (Dkt. No. 26-15 at 32; Dkt. No. 26-17 ¶¶ 11, 12, 16-18; Dkt. No. 30 ¶¶ 11, 12, 16-18).[9]  "The provision of education by nonprofit institutions has long been recognized as a public purpose."  *Fine Mortuary Coll., LLC,* 473 F. Supp. 2d at 161 (citing *City of Worcester v. New England Inst. & New England Sch. of Accounting,* 140 N.E. 470, 472 (Mass. 1957)).  The fact that Defendant's programs included instruction on non-traditional subjects, such as yoga and similar disciplines, does not preclude its qualification as a charitable organization (Dkt. No. 26-15 at 32).  "Education may be particularly directed to either the mental, moral, or physical powers and faculties, but in its broadest and best sense it relates to them all."  *Mt. Hermon Boys' Sch. v. Gill*, 13 N.E. 354, 357 (Mass. 1887).  *See Cummington Sch. of the Arts, Inc. v. Bd. of Assessors of Cummington,* 369 N.E.2d 457, 462 (Mass. 1977) ("Our cases have recognized an institution's entitlement to exemption even where its educational goals were not within traditional areas of education.") (citing cases).

Plaintiff challenges Defendant's characterization as a "'charity'" for purposes of the charitable immunity statute on the ground that it serves only yoga "enthusiasts," and does not meet the requirement of benefitting an "'indefinite class of persons" or the "'public at large'" (Dkt. No. 29 at 9-10).  *See New England Legal Found.,* 670 N.E.2d at 159 ("[I]f . . . work [that promotes the public good] is only incidental to benefits provided to members or some other limited class, [plaintiff] would not qualify [as a] charitable organization . . . .") (citing *Mass.*

---

[9] Defendant also promoted athletic exercises, which is a charitable purpose (Dkt. No. 26-15 at 3 ¶ 9).  *See In re Troy,* 306 N.E.2d 203, 227 (Mass. 1973) (recognizing education and athletic exercises as charitable purposes).

*Med. Soc'y v. Assessors of Boston,* 164 N.E.2d 325, 328 (Mass. 1960); *Young Men's Protestant*

*Temperance & Benevolent Soc'y v. City of Fall River,* 36 N.E. 57, 57-58 (Mass. 1894)).

However, the undisputed evidence shows that Defendant's programs benefitted "an indefinite

class from among the public" as well as the general public. *Cummington Sch. of the Arts, Inc.,*

369 N.E.2d at 461 (citing *Garland Sch. of Home Making,* 6 N.E.2d at 381). The Supreme

Judicial Court has "not set a precise number of persons that an organization must serve to claim

charitable status." *New England Legal Found.,* 670 N.E.2d at 159. "[A]lthough at any given

moment an organization may serve only a relatively small number of persons, if that membership

is fluid and is drawn from a large segment of society or all walks of life, the organization may

qualify as charitable." *Id.* (citations omitted). Kripalu's programs, seminars, and spiritual

retreats were open to the public and included people who did not seek certification in a

discipline, but paid to attend individual classes and programs (Dkt. No. 26-15 at 3 ¶ 9, 32; Dkt.

No. 26-17 ¶¶ 15, 16, 24; Dkt. No. 30 ¶¶ 15, 16, 34). Inasmuch as almost 30,000 members of the

general public attended Kripalu each year, Defendant's curriculum offerings benefitted an

indefinite class of persons as opposed to dues-paying members or a limited group (Dkt. No. 26-

15 at 32). *See Cummington Sch. of the Arts, Inc.,* 369 N.E.2d at 460-61 (although a "closed"

group of people benefitted from a school that conducted "an arts program for arts educators and

advanced arts students," the school qualified as a charity because there was a "substantial . . .

turnover of participants from year to year."). *Contrast New England Legal Found.,* 670 N.E.2d

at 159 ("That an organization's benefits go in whole or in large part to members who pay dues or

fees suggests a mutual benefit society or private charity not entitled to tax exemption."); *Mass.*

*Med. Soc.,* 164 N.E.2d at 329 (because "[t]he declared purpose of the [plaintiff] indicate[d] that it

[was] operated primarily for the betterment of a particular limited group of persons [members of

the medical profession]," it was not a charity entitled to tax exemption; *Blauvelt v. AFSCME Council 93, Local 1703,* 910 N.E.2d 956, 960 (Mass. App. Ct. 2009) (a union, which existed "primarily for the benefit of its members," did not qualify for charitable immunity).  In addition, students of Kripalu's School of Yoga, who became certified as yoga instructors, reached a broader segment of the public through their teaching (Dkt. No. 26-4 at 8; Dkt. No. 26-9 at 17). *See Fine Mortuary Coll., LLC,* 473 F. Supp. 2d at 161.

The fact that attendees paid a fee to attend Kripalu's courses "is not sufficient to take [Kripalu] out of the protection of [Mass. Gen. Laws ch.] 231, §85K." *Harlow v. Chin,* 545 N.E.2d 602, 613 (Mass. 1989).  *See New England Inst. & New England Sch. of Accounting, Inc.,* 140 N.E.2d at 475 (fees charged for services do not "destroy the public character of its purpose").

This is not a case where material facts surrounding Defendant's charitable status are in dispute.  Consequently, in view of the totality of the uncontroverted evidence, Defendant has met its burden of demonstrating that it is a "charitable organization" for purposes of Mass. Gen. Laws ch. 231, § 85K.

### 2. The alleged tort was committed in the course of an activity that accomplished Defendant's charitable purpose.

Because Plaintiff was injured while attending the 200-hour yoga teacher training course for which she paid a fee, she contends that Defendant's alleged negligence occurred during activities that were "commercial in nature and not serving any public good" (Dkt. No. 29 at 11). Therefore, according to Plaintiff, Defendant is not entitled to the charitable immunity cap (*id.*). Inasmuch as providing yoga instruction is "[Defendant's] mission as a charitable organization," Plaintiff's argument is not persuasive.  *Mazzone,* 2019 WL 246767, at *2.

The Massachusetts Supreme Judicial Court has held that "the inquiry into whether an activity is primarily commercial in nature cannot be separated from the inquiry into whether that

activity accomplishes directly the goals of the charity." *In re Bos. Reg'l Med. Ctr., Inc.*, 328 F. Supp. 2d 130, 154 (D. Mass. 2004) (citing *Conners,* 789 N.E.2d at 136-37). The fact that Defendant's instructional courses and programs produced revenue is not dispositive of the issue of whether or not the activities accomplished Defendant's charitable purpose. *See Missett v. Cardinal Cushing High Sch.,* 680 N.E.2d 563, 567 (Mass. App. Ct. 1997) ("Generating revenue does not alone mean that an activity is 'primarily commercial.'").

> The distinction is between activities primarily commercial in character carried on to obtain revenue for charitable purposes, . . . where there is liability for negligence, and activities carried on to accomplish directly the charitable purposes of the corporation, incidentally yielding revenue, . . . where there is no liability for negligence.

*McKay v. Morgan Mem'l Co-op. Indus. & Stores, Inc.,* 172 N.E. 68, 69 (Mass. 1930) (citations omitted). "In the context of § 85K, an activity is 'primarily commercial' only when it is 'entirely disconnected' from the charity's purposes." *Missett,* 680 N.E.2d at 567 (citing cases). *See Harlow,* 545 N.E.2d at 613 (an activity is "commercial" rather than "charitable" only if its sole objective is to generate revenue). Here, Plaintiff alleges that she was injured by Defendant's negligence while attending a course to become a certified yoga instructor. Because the alleged tort occurred during Plaintiff's enrollment in one of Kripalu's School of Yoga's educational programs and the program was an activity that directly accomplished Defendant's stated charitable mission, the charitable immunity statute limits the amount of damages Plaintiff can recover. *See Mazzone,* 2019 WL 246767, at *3; *Keene v. Brigham and Women's Hosp., Inc.,* 786 N.E.2d 824, 836 (Mass. 2003) (Section 85K "limit[s] . . . the amount of civil damages that can be recovered from a charitable corporation that causes harm by committing a tort in the performance of its charitable purpose.").

The court finds, therefore, that Defendant qualifies for charitable immunity and liability on the negligence claim will be limited to $20,000 exclusive of interest and costs pursuant to Mass. Gen. Laws c. 231, § 85K.

V.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 26) is DENIED as to the negligence cause of action in the complaint, but ALLOWED with respect to the application of Mass. Gen. Laws ch. 231, § 85K, which limits recoverable damages to $20,000 exclusive of interest and costs.  Counsel are directed to confer and propose three mutually convenient dates prior to March 15, 2019 for a status conference.

It is so ordered.

Date:  February 5, 2019                                   /s/ Katherine A. Robertson
                                                          KATHERINE A. ROBERTSON
                                                          U.S. MAGISTRATE JUDGE